## UNITED STATES v. FLORIO.

United States District Court
S. D. New York.
Dec. 24, 1952.

Myles J. Lane, U. S. Atty. for Southern District of New York, New York City, Robert Martin, Asst. U. S. Atty., New York City, of counsel, for United States of America.

Menahem Stim, New York City, Allen S. Stim, New York City, of counsel, for defendant.

IRVING R. KAUFMAN, District Judge.

On December 16, 1952, when this case was called for trial, the defendant Edward Florio moved this Court for a change of venue to another district under Rule 21 of the Federal Rules of Criminal Procedure, 18 U.S.C.A., on the ground that pre-trial publicity in this District had created a climate so hostile to the defendant that he would be denied a fair trial by an impartial jury if this case proceeded to trial in this District. This motion was granted and the case proceeded to trial on December 18, 1952 in the District of Columbia.[1]

In view of the widespread interest which this motion has occasioned, I deem it appropriate at this time to set forth in somewhat greater detail the views which I expressed from the bench on granting the motion.

Rule 21(a) of the Federal Rules of Criminal Procedure provides:

"(a) *For Prejudice in the District or Division.* The court upon motion of the defendant shall transfer the proceeding as to him to another district or division if the court is satisfied that there exists in the district or division where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial in that district or division."

The technique of avoiding the effect of pre-trial publicity by moving the trial to another locality before the jury is impaneled has long been recognized in the state courts, see Note, Controlling Press and Radio Influence on Trials, 63 Harv.L. Rev. 840, 844 (1950); and, by virtue of this Rule, is now available in the Federal courts as well; Notes of Advisory Committee on Rules, 18 U.S.C.A. p. 242. The problem presented therefore was whether the defendant had made a sufficient showing of a local prejudice against him to satisfy the court that Rule 21 might properly be invoked.

I emphasize that this case was to proceed to trial and the selection of a jury on the morning of December 16th. On that very morning, in connection with the preliminary motion for change of venue, there was placed in evidence an article appearing in the New York World Telegram, dated December 15, 1952 and articles appearing in the New York Daily News, New York Daily Mirror, New York Times and New York Herald Tribune, dated December 16. Some of these stories described the defendant as a "mobster" and leader of a notorious organization known as the "Ed Florio gang". Frequent mention was made of the fact that the defendant was an ex-convict and repeated reference was made to events and accusations which associated the defendant with crimes bearing no relation to the present indictment. Of particular significance was the fact that this avalanche of publicity, with bold headlines concerning "dock racketeering" and Florio himself, reached the pub-

---

1. After the Court indicated its intention to grant this motion, the government and defense counsel agreed upon the District Court of Washington, D. C., as the district to which the case should be removed. Indeed, the government offered but token opposition at the outset to the granting of the motion and subsequently expressed itself as being in favor of the change of venue. The case proceeded to trial on December 18th and was concluded on December 19th by a plea of guilty entered by the defendant after the jury had retired to deliberate. This Court was assigned to preside at the trial in the District of Columbia, no judge from that District being available.

lic on the very morning when the jury was to be impaneled. This publicity was not of the usual sort which accompanies an important trial of public interest. Much of the material which appeared in the press had its origin in the work of the New York State Crime Commission which was currently investigating conditions on the New York waterfront. The issues which these newspaper articles discussed concerned a matter of peculiarly local interest. Public interest in the work of this Commission was and is great and it is understandable that the newspapers of this city would endeavor to bring to the citizens of New York a full coverage of the activities and disclosures of that Commission. It was also reasonable to assume that because of this great local interest, the amount of coverage which these matters received and the interest created by these articles in the New York area was far in excess of that accorded this subject elsewhere.[2] Furthermore, by reason of the startling disclosures made at the hearings referred to, it was reasonable to assume that every reader of newspapers in this district had read these disclosures and was shocked by them.

The intensity and the timing of the publicity which this defendant received, as well as the local nature of the incidents with which they dealt, presented a situation I believe to be unique. We were faced with a defendant being called to trial, before a jury to be selected, at the very moment that open hearings were being conducted before a State Crime Commission with revelations being there made, which caused war headlines in newspapers and much discussion on radio and television.

A parallel was supplied in the recent case of Delaney v. United States, 1 Cir., 199 F.2d 107, where the Court held denial of a motion for a continuance reversible error because of the prejudicial effect of pre-trial publicity. In that case it was said at p. 112:

"One cannot assume that the average juror is so endowed with a sense of detachment, so clear in his introspective perception of his own mental processes, that he may confidently exclude even the unconscious influence of his preconceptions as to probable guilt, engendered by a pervasive pre-trial publicity."

It is true that in Delaney both the investigation which stirred up the unfavorable publicity and the prosecution of the defendant were conducted by agencies of the federal government, as distinguished from the New York State Crime Commission and the federal prosecutor in this case. Clearly this is a difference without distinction, for the result in both instances is the same. Indeed, with reference to the climate which prevailed in this District I had before me a much stronger case for taking some action, for, whereas in Delaney the press coverage had abated some time prior to the actual trial and the problem was whether "the prejudicial effect of the aforesaid publicity in the newspapers and magazines, over the radio and on television, had so far worn off that the trial could proceed free of the enveloping hostile atmosphere and public preconception of guilt," here, the publicity had existed for days prior to the trial and became most intense on the very morning when the jury was to be impaneled.

Enjoying as we do a free press, neither the court nor any state or government agency may dictate their policies. Indeed that is as it should be. Judicial intervention to curtail such publications would endanger the constitutional guaranties of the freedom of the press. But the Court cannot ignore the constitutional safeguards placed around a defendant. True, both rights, freedom of the press and the right to a fair and unprejudiced trial, are constitutionally guaranteed. But both can be protected by the exercise of wise judicial discretion in the appropriate case.

2. In fact, at the voir dire of the trial in Washington, D. C., a question asked of the talesmen revealed that no prospective juror had read any account of the defendant's activities or past in the press of that city.

A court may, for example, grant a continuance until the effects of pre-trial publicity have been erased by time. In the instant case the defendant had in fact moved in the alternative for such a continuance. The prosecution strongly opposed any such delay. A defendant has a constitutional right to a speedy trial and if a convenient means exists to conduct the trial expeditiously without unfairness to the defendant, such means deserves careful consideration.

A further technique which is often available to minimize or exclude the effects of pre-trial publicity is to interrogate carefully the talesmen at the voir dire and to eliminate those who indicate that they have read or been prejudiced by matter appearing in the newspapers or elsewhere. In United States v. Moran, 2 Cir., 1952, 194 F.2d 623, certiorari denied 343 U.S. 965, 72 S.Ct. 1058, the Court of Appeals for the Second Circuit upheld a conviction where the trial judge had cautioned the jury at the time of its selection and in his charge, to disregard the considerable and damaging publicity which had attended that defendant's appearance before an investigating committee.

The instant case would have been in a state of suspension if on the voir dire a jury could not have been obtained (and the volume and nature of the pre-trial publicity indicated that such a result was inevitable). A long adjournment would have been the probable result and many months would have elapsed before the defendant would have been brought to justice. Or, perhaps, the case might have proceeded to trial in this District, under the shadow of doubt, and only after appeal would there have been any certainty that the procedures by which it was attempted to punish the defendant for his crime—the commission of which he was later to confess—were to any avail.

It should be noted that in the Moran case, no change of venue had been sought by the defendant, who is the sole party who may urge that Rule 21 be utilized. (The absence of a motion for change of venue was specifically noted by the Court in affirming.) The very enactment of this Rule indicates a belief that circumstances may exist which warrant its invocation and it is my firm conviction that it would be difficult to hypothesize a case where the Rule would be more applicable than the one at hand. It is emphatically not my view that in all cases where there is considerable publicity should the court grant a change of venue. There are instances where granting such a motion "may involve undue delay, extra expense or inconvenience and the objection to the publicity may be only a pretext for avoiding a particular judge or kind of jury." See, Note, supra, 63 Harv.L.Rev. 840, 844 (1950). It is clear that this was not such a case and I place strong emphasis on the peculiar facts present here. The motion was obviously not a dilatory tactic. The publicity was intense, critically timed, and indubitably prejudicial. There was relatively minor inconvenience and little additional expense in trying the case in another district.

The government recognized the advisability of trial outside of this District and made prompt arrangements for trial in the District of Columbia. An immediate trial was had while the local press remained free of any legal or psychological restraint, court or self-imposed, to disseminate to the fullest extent any information made available by the proceedings in New York of the State Crime Commission, which were continuing during the course of the trial in Washington, D. C. For these reasons I exercised my discretion in favor of the motion for change of venue, lest, at the very outset of the trial, the case become infected by reason of the unusual circumstances present here, and all subsequent proceedings be accordingly tainted.