**UNITED STATES of America**
v.
**Carlos MARCELLO.**
**Crim. A. No. 30888.**

United States District Court
E. D. Louisiana,
New Orleans Division.
March 1, 1968.

Louis C. LaCour, U. S. Atty., New Orleans, La., Owen Neff, Joseph J. Tafe, Attys., U. S. Dept. of Justice, Washington, D. C., for the Government.

Jack Wasserman, Wasserman & Carliner, Washington, D. C., Michel A. Maroun, Shreveport, La., G. Wray Gill, New Orleans, La., for defendant.

HEEBE, District Judge:

We are faced with a very unusual problem in this case. The events leading to this unique situation, though, are quite simple. On June 1, 1967, a one-count indictment, alleging that the defendant, in violation of 18 U.S.C. § 111, forcibly assaulted and intimidated an FBI agent engaged in the performance of his official duties, was filed against the defendant, Carlos Marcello. Defendant pled not guilty at his arraignment on June 14, 1967, and was given thirty days in which to file pleadings. On July 3, 1967, defendant filed a motion for a change of venue along with ten other motions.[1] All eleven motions were originally scheduled for oral argument on August 4, 1967, but were continued to September 13, 1967, in order to accommodate defense counsel. At that time the motion for change of venue was heard first at the Court's suggestion. It was readily apparent to the Court from the memorandum and exhibits submitted in support of the motion for change of venue, from the oral argument thereon, and from the exhibits offered into evidence at the hearing, that extensive prejudicial publicity existed which would deprive the defendant of a fair and impartial trial in this district. Consequently, the motion for a change of venue was granted, and the hearing terminated.

Not more than ten minutes after the conclusion of the hearing, defense counsel entered the Court's chambers and, to the complete surprise of the Court, made an oral *ex parte* request for the Court to withdraw its order granting the change of venue which had just been entered. It was somewhat astonishing to the Court, to say the least, for the defendant to move for a change of venue, to argue the motion, and after the motion was granted, to urge the Court to withdraw its order granting the defendant's motion. Nevertheless, the Court suggested that the defendant file a written motion requesting the desired action together with a memorandum in support thereof. On September 14, 1967, the defendant filed the present motion entitled "Motion to Reconsider Order Directing Change of Venue" which was followed by a supporting memorandum. This motion came on for hearing on September 22, 1967, and because of the unique problem it posed, was taken under submission after oral argument.

## I.

Before turning to a consideration of the motion to reconsider our

---

1. The other motions were entitled: Motion To Dismiss for Failure To State an Offense; Motion To Dismiss for Failure To Present Evidence To Warrant Indictment; Motion To Dismiss Indictment Upon the Ground That It Was Procured by Improper Conduct of Prosecuting Officials Herein; Motion To Dismiss Upon the Basis of Immunity; Motion of Defendant To Inspect the Grand Jury Minutes of Testimony of Patrick J. Collins, Jr.; Motion To Inspect All Evidence in the Possession of the Government Favorable to the Defendant; Motion Challenging Grand Jury Array and To Dismiss Indictment Upon Such Challenge; Motion of Defendant for a Bill of Particulars; Motion for Production of Documents and Tangible Evidence for Inspection and Copying Under Rule 16; Motion of Defendant to Suppress Evidence Illegally Obtained. The motion for change of venue was joined with a motion for a continuance and was entitled: Motion for Continuance and for a Change of Venue.

previous order granting the change of venue, we wish to briefly consider change of venue in general and the factors which prompted us to grant defendant's initial motion. A motion for a change of venue involves the interpretation and application of Federal Rule of Criminal Procedure 21(a), Title 18 U.S.C., which provides for a change of venue upon the motion of defendant "if the court is satisfied that there exists in the district where the prosecution is pending so great a prejudice against the defendant that he *cannot obtain a fair and impartial trial* at any place fixed by law for holding court in that district." (emphasis added) This rule is merely a procedural device designed to preserve and protect the accused's constitutional right to a fair and impartial trial. A fair and impartial trial is perhaps most often endangered by prejudicial publicity. Recent Supreme Court decisions make it clear that the courts must be ever sensitive and finely attuned to the prejudice inherent in adverse publicity and must be vigilant in correcting abuses; it is certain that a conviction obtained in an atmosphere contaminated by such publicity will not stand. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed. 2d 600 (1966); Estes v. State of Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Rideau v. State of Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed. 2d 663 (1963); Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961); Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959). It is because the defendant should not be required to stand trial amidst an atmosphere tainted with prejudice and thus be dependent upon an appeal to secure his rights that Rule 21(a) offers its protection to him. Although not at issue here, there are two aspects of Rule 21(a) which we think merit comment.

The rule adopts the exact phraseology ("fair and impartial trial") which has evolved as the constitutional guarantee provided by the due process clause and by the Sixth Amendment right to trial by an impartial jury. It might thus appear that the invocation of the rule is to be measured by the same standards applicable to the constitutional guarantee; that is, a change of venue under Rule 21(a) might seem to require the same showing which is necessary to reverse a conviction on the ground that the defendant's right to a fair and impartial trial was violated. This, in turn, coupled with the use of the word "cannot," might be construed as meaning that a change of venue could be granted *only* when it could be said that a conviction, if obtained, *must* be reversed on appeal. A strict literal interpretation of Rule 21(a) may support such a view. If so, perhaps a substitute in the rule for the word "cannot" could be suggested because the rule, by its very nature, does not require this nor have the courts required it. It is well to note that the restrictive connotations of the word "cannot" are ameliorated in the rule by the use of the word "satisfied." This may well be the statutory basis for the well-settled rule that a motion for a change of venue is directed to the sound discretion of the court. Bearden v. United States, 320 F. 2d 99, 101 (5th Cir. 1963); Greenhill v. United States, 298 F.2d 405, 411 (5th Cir. 1962); Shockley v. United States, 166 F.2d 704, 709 (9th Cir. 1948); Kersten v. United States, 161 F.2d 337 (10th Cir. 1947). Yet it could hardly be suggested that the vital constitutional right to a fair and impartial trial hinges upon the discretion of a trial judge. This should demonstrably illustrate the difference. The rule is preventative. It is anticipatory. It is not solely curative as is a post-conviction constitutional attack. Thus, the rule evokes foresight, always a more precious gift than hindsight, and for this reason the same certainty which warrants the reversal of a conviction will not always accompany the change of venue. Succinctly, then, it is the well-grounded *fear* that the defendant will not receive a fair and impartial trial which warrants the application of the rule. Singer v. United States, 380 U.S. 24, 35, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965). As the Supreme Court recently stated in Sheppard v. Maxwell, supra, venue should be changed "where there

is a *reasonable likelihood* that prejudicial news prior to trial will prevent a fair trial." (emphasis added) 384 U.S. at 363, 86 S.Ct. at 1522. The many cases which we have examined indicate that this is the federal practice. See United States v. Kline, 205 F.Supp. 637, 639–640 (D.Minn.1962), for example, where this practice was explicitly recognized. It is thus clear that the meaning of Rule 21(a) which a very strict literal interpretation of the statute might suggest contravenes both the nature and the obvious intent of the rule. Further, we have found no indication that any court has ever accepted such a thwarted view of the rule. In fact, we have paused to consider this point only because the bare wording of the rule raises the possibility.

■■■■ Before turning to the facts of this case, there is another facet of change of venue which we think warrants discussion. A casual reading of some of the cases seems to indicate that the determination of whether or not to grant a change of venue is to be made only at the *voir dire*. Blumenfield v. United States, 284 F.2d 46, 51 (8th Cir. 1960); United States v. Hoffa, 156 F.Supp. 495, 500 (S.D.N.Y.1957); United States v. Malinsky, 20 F.R.D. 300, 303 (S.D.N.Y. 1957); United States v. Dioguardi, 20 F.R.D. 33, 36 (S.D.N.Y.1956); United States v. Eisler, 75 F.Supp. 634, 639 (D.D.C.1947). The *voir dire* is definitely one possible time at which to make the determination. It is, however, certainly not required that the determination be made at that time. The rule itself provides that the transfer may be made when the court is "satisfied * * *." Thus, by the very terms of the rule, venue may be changed *whenever* the court is "satisfied," whether this be at some time prior to the *voir dire*, at the *voir dire*, or at the trial itself. Indeed, in at least three cases, the motion for change of venue was granted prior to the *voir dire*. United States v. Rossiter, 25 F.R.D. 258 (D. Puerto Rico 1960); United States v. Parr, 17 F.R.D. 512 (S.D.Tex. 1955); United States v. Florio, 13 F.R.D. 296 (S.D.N.Y.1952). Loose statements found in cases such as those cited above that the determination of whether or not to grant a change of venue is to be made at the *voir dire* certainly do not establish any rule of law that the *voir dire* is the only time at which the determination may be made. They only represent the proposition that in many cases the court will not be *satisfied* until an examination of the jurors upon the *voir dire* that the requisite prejudice exists which warrants a change of venue.[2]

Further, the efficacy of depending upon the *voir dire* to determine whether substantial prejudice exists has recently been seriously questioned. Comment, Fair Trial v. Fair Press: The Psychological Effect of Pre-Trial Publicity on the Juror's Ability to Be Impartial; A Plea for Reform, 38 So.Cal.L.Rev. 672 (1965). Indeed, as the court stated in Delaney v. United States, 199 F.2d 107 (1st Cir. 1952):

"One cannot assume that the average juror is so endowed with a sense of detachment, so clear in his introspective perception of his own mental processes, that he may confidently exclude even the unconscious influence of his preconceptions as to probable guilt, engendered by a pervasive pre-trial publicity." at 112–113.

Realizing this danger, the Supreme Court has recognized that when the pre-trial publicity is great, the court may disregard prospective jurors' assurances of impartiality. Irvin v. Dowd, supra, 366

---

2. This proposition is the very principle which we alluded to and found governing in the circumstances of a case previously decided by this Court. United States v. Hinton, 268 F.Supp. 728, 730–731 (E.D. La.1967). In that case the publicity consisted solely of two newspaper articles which had appeared over two years previously. In that case it was clear that such scant publicity did not raise any presumption of prejudice, and it was necessary to await the *voir dire* to determine if any prejudice did exist. Here, though, the avalanche of adverse publicity clearly raises a presumption of prejudice so that it is unnecessary to postpone the determination until the *voir dire*.

U.S. at 727–728, 81 S.Ct. 1639; Sheppard v. Maxwell, supra; 8 Moore, Federal Practice, p. 58 (1967 Cum.Supp.); see also, Broeder, Voir Dire Examinations: An Empirical Study, 38 So.Cal.L.Rev. 503 (1965). It is therefore quite proper, if not indeed required in some instances, to make the determination, as we have done, solely on the basis of the pre-trial publicity which has undoubtedly, as here, created a dominant sentiment of prejudice in the community. Note, The Efficacy of a Change of Venue in Protecting a Defendant's Right to an Impartial Jury, 42 Notre Dame Lawyer 925, 933–937 (1967).

■ However, it is still very clear that any defendant who seeks a change of venue is presented with a formidable task, and, consequently, few defendants succeed in gaining a change of venue. 4 Barron, Federal Practice & Procedure § 2092; 8 Moore, Federal Practice ¶ 21.03; Note, The Efficacy of a Change of Venue in Protecting a Defendant's Right to an Impartial Jury, 42 Notre Dame Lawyer 925, 929–930 (1967); Annot., 10 L.Ed.2d 1243, 1272–1287 (1964). Yet it is equally clear that it is not to be denied when the facts of the case warrant it. Because there obviously can be no artificial formula concocted to serve as a "litmus test," [3] United States v. Wood, 299 U.S. 123, 145–146, 57 S.Ct. 177, 81 L.Ed. 78 (1936), the determination of whether prejudice prevails can be made only upon a consideration of the totality of the circumstances of each particular case.

## II.

■ We now turn to the facts of this case which compelled us to grant the defendant's motion for a change of venue. Carlos Marcello, the defendant and resident of neighboring Jefferson Parish, is a well-known figure throughout the New Orleans area. His notoriety is due in large part to the nefarious publicity he has continuously attracted in this locale for many years. The newspaper exhibits

which were submitted in support of the motion for change of venue are only samples of the substantial and constant publicity Marcello has received over the years. An examination of these exhibits will serve to illustrate the sinister image of Marcello which has been conveyed to the public via such publicity. On September 23, 1966, a local newspaper, the Times-Picayune, featured a front-page story describing a raid in New York and the arrest of Marcello and twelve others. The article was boldly titled: "Marcello Arrested; N.Y. Gathering Raided." The article stated that Marcello and the others who were arrested were high-ranking members of the infamous Cosa Nostra, and described the meeting which precipitated the arrests as a "Little Apalachin." The paper stated that such raids were a useful device "in keeping tabs on underworld activities." Photographs of Marcello and his brother, Joseph, also appeared on the front page in connection with the article. On the same day another local newspaper, the States-Item, published an editorial cartoon depicting Marcello's arrest in New York and indicated that Marcello has successfully avoided deportation for thirteen years. While Marcello and those arrested with him were waiting to testify before a grand jury in New York, the courthouse was evacuated while the police investigated a report that a bomb was planted in the building. This incident was described on the front page of the States-Item on September 26, 1966, under the broad title: "Bomb Scare Delays Marcello's Quizzing." Characterizing the group as "underworld leaders," the article specifically referred to Marcello as "the Jefferson Parish rackets figure." The newspaper quoted the New York District Attorney as saying that the 1966 meeting "overshadows the Apalachin meeting," and also stated that an internal struggle for power within the ill-reputed Mafia was thought to be the reason for the meeting. An article in the September 30, 1966 edition of the

---

**3.** At least one author, however, does suggest a formulary method as a solution to the problem. See Note, 33 U.Chi.L. Rev. 512, 523–530 (1966).

Times-Picayune was titled: "U. S. Grand Jury Probe To 'Rock Country,' View—Organized Crime Involved, Says LaCour"; and it quoted another government official working closely with U. S. Attorney LaCour as saying that the arrest of Marcello in New York "makes it obvious that there is organized crime in this area [Louisiana] and that Marcello was there in the interests of this area." This quote was repeated in the leading editorial of the October 1, 1966 edition of the States-Item wherein the editor implored the local district attorney to ferret out the local underworld elements and bring them to justice.

Such items are numerically insignificant when compared to the mass of publicity which the defendant has attracted here. The Court itself is personally aware of the avalanche of unabated adverse publicity which has inundated the New Orleans area for many years and which continues to this very date undiminished in intensity. The above items are merely illustrative of the intense local concern which exists regarding the defendant's activities. They also reveal the tenor of such publicity and indicate the prevalent notion, which is sponsored by the news media and entertained by the populace of this area, that Marcello is the leader of the Cosa Nostra or Mafia in Louisiana.

The details of the incident leading to the present prosecution also received front-page treatment in New Orleans. On October 1, 1966, the States-Item featured a page-one story, which defendant submitted as an exhibit, describing in vivid detail the events constituting the alleged offense. The conspicuous title was: "Marcello Is Arrested In Assault on Agent," and the subheading was: "$50,000 Bond Posted Fast Here." The article quoted statements from Marcello and his attorney and referred to Marcello as "the Jefferson Parish crime figure." A photograph accompanied the article and actually shows Marcello striking the agent. The photograph was captioned in part: "Carlos Marcello, Jefferson Parish crime figure, hauls off and punch-

es an unidentified FBI agent at New Orleans International Airport. The incident took place last night as Marcello returned from New York where he and other crime personalities were arrested and brought before a Grand Jury probe into organized crime." It is impossible to overlook the damaging prejudice to Marcello created by this article and the photograph of the alleged crime as it actually occurred if he were required to stand trial on this charge here in New Orleans.

Perhaps some of the most damaging publicity exhibited herein is to be found in the September 1 and September 8, 1967 copies of Life Magazine. These articles purport to "expose" organized crime in the United States. They were obviously intended to inflame the public and arouse the ire of the conscientious citizenry against the unsavory activities of the national crime syndicate. On September 1, 1967, the cover of Life read: "Brazen Empire of Organized Crime—The Alarming Growth of a Multibillion-Dollar Cartel Founded on Corruption, Terror and Murder." A week later the cover read: "Brazen Empire of Crime, Part II—How the Mob Muscles Into Your Daily Life." The feature article was entitled: "The Mob." In infuriating style, calculated to alarm and arouse the reader, the article vividly described the sordid operations of the multibillion-dollar crime syndicate in this country, commonly known as the Cosa Nostra or Mafia. Not only did the articles reveal the disgusting sources of illegal income to the syndicate—narcotics, prostitution, gambling, and the like—but they also described the thoroughly repulsive methods used to achieve and maintain power, which methods range from cheating and defrauding, bribery and political corruption, to more violent acts of terrorism, bombings and outrageous, brutal murders. Specific instances, complete with names, dates and locations, substantiated each of these claims. In addition, the identities of the alleged leaders of this odious association were revealed, and photographs of each, including Marcello, accompanied the articles. The activities of many of these

men, referred to as "murderers and thieves," were discussed at length. Both editions of the magazine focused particular attention upon Marcello and his activity in Louisiana.

One article, entitled "The Fix" and featuring a full-page close-up photograph of Marcello, gave an account of a two million dollar bribery attempt, headed by Marcello, which was designed to secure the release of a convicted felon, James Hoffa. Another article describing Marcello's empire had a two-page title reading: "Carlos Marcello: King Thug of Louisiana." This article bared his alleged Cosa Nostra operations here in Louisiana. The story was substantiated in detail with well-known names, including politicians and state officials who are allegedly controlled or influenced by the Cosa Nostra, in addition to places and dates, and was bolstered with many photographs. In addition, the article reviewed the details of the present prosecution. These magazine articles, together with articles from the September 12 and 13, 1967 editions of the Times-Picayune which reported the Governor of Louisiana's desire to "get rid of Marcello," were offered as exhibits at the hearing in support of the motion for change of venue.

The highly inflammatory effect in this area of the Life articles cannot be denied. Shortly after they appeared, the Governor of Louisiana made a fiery and determined pledge to oust organized crime from the state. This prodded a number of grand jury investigations into organized crime activities in the state. These investigations, in which Marcello figures prominently, are still continuing. Almost daily accounts of the latest developments saturate the local news reports.

This Court is definitely of the opinion that the publicity which the defendant has received has been so highly prejudicial in nature and so pervasive in this area that it would prevent the defendant from receiving a fair and impartial trial in this state. For many years the defendant has been the subject of very extensive and damaging local publicity. This publicity has undoubtedly imprinted upon the mind of the public the image of the defendant as being a most sinister and evil character. In fact, it is assumed, in a rather cavalier fashion, that Marcello is the "gangland leader" in Louisiana of the most ruthless and corrupt crime syndicate in the nation. We seriously doubt that the citizens of this area could expunge this long-standing and prevalent notion from their minds in an attempt to objectively consider the merits of this case.

The current publicity accorded Marcello, which is highly prejudicial in its own right, continues to foster this image. His past criminal record is repeatedly reviewed and kept in the public eye. In fact, all but a small portion of the present prejudicial publicity has concerned offenses and accusations totally unrelated to the instant prosecution. However, the publicity which the present prosecution attracted was also very damaging. If the memory of this year-old offense had ever commenced to fade, it was shockingly revived and reviewed by the intensely inflammatory articles recently appearing in Life. These startling articles caused a furor among the people of Louisiana. At present there is still no indication that the outraged indignation caused by the Life articles will subside in the near future.

With all of these factors in mind, we felt that defendant would have a much better chance of securing a fair and impartial trial in another state. The abusive publicity constantly showered on Marcello by the local news media has certainly not had the same effect outside the state if, indeed, it has even progressed beyond the boundaries of the state. And while it is true that Life magazine is circulated nationally, we are certain that the articles primarily concerned with Marcello were not read in most other states with as much interest, or with the same effect, as here in Louisiana. Because these articles were particularly directed to Louisiana, they had a peculiar interest for Louisiana readers, and it is

only natural to expect that they would be read with greater attention by, and be more impressive upon, Louisiana readers.

For these reasons it was readily apparent to this Court that Marcello was entitled to a change of venue as he requested, and we had no hesitancy in granting his motion. Rideau v. State of Louisiana, supra; United States ex rel. Bloeth v. Denno, 313 F.2d 364 (2d Cir. 1963); Juelich v. United States, 214 F.2d 950 (5th Cir. 1954); United States v. Rossiter, supra; United States v. Parr, supra; United States v. Florio, supra.

### III.

With this background, we now proceed to a consideration of the present motion urging us to withdraw our former order granting the change of venue. While the defendant's argument on this motion has not been sharply defined, the defendant basically contends that he withdrew his motion for change of venue and that even if he did not, he has the constitutional right to be tried here and that he has not waived that right.

First, we deal with the contention that the defendant abandoned his motion for change of venue at the oral argument. This contention is based solely on the fact that at oral argument counsel for defendant informed the Court that he was not "pressing" the request for change of venue. Four cases are cited to support this contention: Southeastern Express Co. v. Robertson, 264 U.S. 541, 44 S.Ct. 424, 68 L.Ed. 840 (1924); Abrams v. American Security & Trust Co., 72 App.D.C. 79, 111 F.2d 520, 129 A.L.R. 368 (D.C.Cir. 1940); United States v. Chicago B. & Q. R. Co., 82 F.2d 131, 106 A.L.R. 942 (8th Cir. 1936); State v. Blount, 200 Or. 35, 264 P.2d 419, 436, 44 A.L.R.2d 711 (1953). An examination of these cases, however, reveals that they are completely inapposite to the facts of the present case, and they fail to sustain defendant's contention.

In fact, it is very clear that the defendant did not abandon or withdraw his motion for change of venue. When asked if he was ready to argue the motion for change of venue, defense counsel replied: "Yes, I will be very happy to." Then he proceeded to very forcefully argue the motion and pointed out all the reasons why the motion should have been granted. There is no indication whatsoever that defendant intended to withdraw or abandon the motion. Even the singular straw which defendant now grasps to support this argument withers when the statement is taken in context. Defense counsel stated: "I feel that we should not be obligated to try this case in this atmosphere at this time. I am, naturally, withdrawing a request for a change of venue—*I beg your pardon*—I am not pressing my request for a change of venue at this time." Thus, it is abundantly clear that abandonment of the motion for change of venue was not within defendant's contemplation and cannot be inferred as defendant now urges. In fact, the above statement shows that defendant definitely and clearly did not want to abandon the motion. Further, it would be utterly absurd to believe that if the motion had been denied and if the defendant had been convicted that a higher court would then preclude the defendant from arguing on appeal that this Court erred in denying the motion for change of venue on the basis that it had been abandoned. Corey v. United States, 346 F.2d 65 (1st Cir. 1965); Maxwell v. United States, 334 F.2d 181, 184 (5th Cir. 1964). There is, simply and clearly, no merit to the argument that the motion for change of venue was abandoned.

The defendant, however, would have us believe that he preferred to have a continuance to a change of venue. We gather this from Marcello's affidavit, accompanying the present motion, which states: "Subsequent to the publication of the Life magazine articles, and prior to September 13, 1967, I advised my attorneys that I desired a postponement of my case because of adverse and prejudicial publicity but not any change of venue," and from the motion itself which reads: "Defendant Carlos Marcello had

instructed his counsel not to pursue a change of venue after the publication of the Life Magazine articles * * *." Significantly, these carefully worded statements refrain from claiming that the defendant did not want a change of venue in any event. Indeed, if the defendant had made such a statement, the circumstances of this case would necessitate our finding the statement to be totally incredible. The gist of the statements is that the defendant wanted a continuance first and foremost. Thus, they merely amount to an allegation by the defendant of his *preference*. Assuming that the defendant did, in fact, prefer a continuance to a change of venue, we fail to see how this has any legal effect under the circumstances of this case.

 The motion was one for a continuance *and* a change of venue. The motion for change of venue was not an alternative motion, nor was it ever in any way conditioned upon the failure to gain a continuance. The defendant simply asked for two things in the same motion. While this may be somewhat unusual, it was our understanding at the time the motion was filed, and during the argument thereon, that the defendant was simply seeking to obviate the substantial prejudice prevailing against him in this district by one means or another and that it did not make any difference which method was used as long as the result—a fair and impartial trial free from prejudice—was obtained. As we noted during argument on the original motion, we did not believe that a continuance would accomplish the result sought by the defendant due to the continuing nature of the prejudicial publicity in this area. It is pertinent to observe at this point that time has proved our judgment of five months ago to be correct in this respect. In relation to how long a continuance would have to be in order to be effective, defense counsel suggested five months. Five months have elapsed, and we are even more firmly convinced that the defendant could not obtain a fair and impartial trial in this district due to the prejudice created by constant adverse publicity. The continuous nature of such publicity simply forecloses this possibility at the present as well as at any foreseeable time in the future. Obviously nothing is gained by a continuance under such circumstances, except to delay the inevitable, and it is improper to grant the continuance in such a situation because it does not obviate the difficulty. United States v. Bonanno, 177 F.Supp. 106, 122 (S.D.N.Y. 1959); United States v. Hoffa, 156 F. Supp. 495, 500 (S.D.N.Y.1957). Consequently, the only efficacious means available to secure the result sought by defendant was to grant the change of venue which he requested. The change of venue sought by the defendant is peculiarly effective in this situation in light of the fact that the continuous pervasive publicity attendant in this area does not exist in other areas, and the fact that such publicity as does exist elsewhere would not arouse the same indignation as locally. In granting the change of venue, we secured for the defendant what he so desperately wanted—a fair and impartial trial—by the only effective method of the two he requested—a change of venue. For the defendant to now say that he preferred to have a continuance is without legal effect unless, of course, his request for change of venue was conditioned upon his failure to obtain a continuance. But it was not so conditioned, and the defendant does not even claim now that it was conditioned. Had we ever thought that it was, either expressly or impliedly, we would have merely denied the motion for continuance in order to bring the condition into effect, and then granted the motion for change of venue. However, it was very clear to us that such was not the case and, as we indicated at oral argument, we thought it would be more proper to leave the motion for continuance intact in order that the defendant might urge it to the transferee court in the event that the Life articles did have a damaging effect in that district.

 We turn now to the defendant's contention that his waiver was ineffective. Article III, Section 2, Clause

3 of the United States Constitution and the Sixth Amendment to the Constitution grant a defendant the right to be tried in the state and district where the alleged crime was committed. It is clear, though, that this right is a personal privilege which may be waived by the accused. Hilderbrand v. United States, 304 F.2d 716, 717 (10th Cir. 1962); Lafoon v. United States, 250 F.2d 958, 959 (5th Cir. 1958); Earnest v. United States, 198 F.2d 561, 562 (6th Cir. 1952); United States v. Gallagher, 183 F.2d 342, 345–347 (3rd Cir. 1950); Levine v. United States, 182 F.2d 556, 558–559 (8th Cir. 1950). This right is clearly waived when the defendant seeks a change of venue. Federal Rule of Criminal Procedure 21, Notes of Advisory Committee on Rules, Comment 3; 4 Barron, Federal Practice & Procedure § 2092; 8 Moore, Federal Practice ¶ 21.02. While we need not decide whether the bare motion for a change of venue operates as a waiver, we do hold, in light of the plain meaning of the authorities just cited, that when the motion was granted, the waiver became effective even though a written order implementing the change has not yet been entered. The defendant's contention that he will not accept transfer to the district we now assign and therefore has not waived his right to be tried here is based upon United States v. Parr, supra. In that case the prosecution was instituted in the Corpus Christi Division of the Southern District of Texas and the defendant requested that the case be transferred to the Laredo Division of that same district. The defendant made it clear, however, that he wished to be transferred only to the Laredo Division and that if the case was not transferred to the Laredo Division, then he wished to be tried in the Corpus Christi Division. Marcello, however, did not so limit his request nor did he even suggest any district to which the case might be transferred. Thus, his reliance on *Parr* is obviously misplaced. Further, *Parr* involved a transfer from one division to another within the same district and was based on Rule 19 which, at that time, *required* the defendant to consent to the particular transferee district. It was to avoid the possible debilitating consequences of *Parr* that Rule 21(a) was amended in 1966 to make it clear that the court may select the district to which the case may be transferred. Thus, the defendant's contention that he does not now consent to a transfer is without merit in view of the fact that he has already waived his right to be tried here and the fact that he has no right to, nor did he in fact, insist on a transfer to any particular district.

The defendant, however, would have us believe that he, personally, did not desire a change of venue and, predicated on this postulate, he argues that his waiver was ineffective in light of Green v. United States, 355 U.S. 184, 191, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957) and Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), because it was not a knowing and voluntary relinquishment of his constitutional right.

We are certainly in complete agreement with the assertion that a waiver of this constitutional right requires the defendant to know and fully understand the nature of his right before the waiver will be effective. Johnson v. Zerbst, supra. The defendant, however, does not contend that he did not fully know and understand his rights, and we have no independent cause to suspect otherwise in view of the fact that he is not an illiterate or ignorant man, but rather is quite intelligent and very articulate, and the additional fact that he was represented by three highly competent and experienced trial attorneys who most surely advised him of his rights. The defendant's own affidavit accompanying the present motion indicates that he was personally aware of his right to be tried here. Thus, we have no doubt whatsoever that the defendant here did fully understand and appreciate the nature of his rights and the effect that a change of venue would have. Further, even if this were a case where the defendant's own personal knowledge of his rights was in doubt, it would make no difference because his attorneys'

choice would be binding upon him as an effective waiver. Henry v. State of Mississippi, 379 U.S. 443, 451–452, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965); Miranda v. State of Arizona, 384 U.S. 436, 513, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (Harlan dissenting).

We fail to see, nor does the defendant suggest, how the defendant's present assertion that he preferred a continuance to a change of venue could in any way detract from the voluntary or intentional nature of the waiver in view of the fact that the defendant did forcefully urge his motion for change of venue. Certainly, this was no " 'grisly,' hard, Hobson's choice" which would operate to relieve the defendant of his waiver. Whitus v. Balkcom, 333 F.2d 496, 499 (5th Cir. 1964). See also Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). We are completely satisfied that the defendant's actions were deliberate, intentional, and wholly voluntary in every respect.

The defendant does not claim that his attorneys disobeyed his instructions by obtaining the change of venue nor does he claim that they were derelict in their duties by not withdrawing the motion for change of venue. The defendant would have more substantial legal standing if he had done so, though. However, if it had been defendant's intention to attack his attorneys, we think that it would only be reasonable to expect him to do so explicitly. We are slow to draw such an irrational inference when, as here, the defendant is represented by three very capable and reputable attorneys. This is especially true when the defendant has shown nothing to substantiate such a claim and when all the circumstances indicate exactly the contrary.

The defendant was represented by *three* very competent and experienced attorneys, and it would be highly improbable that any one, much less all three, would be derelict in carrying out the defendant's wishes. It would be even more *improbable that they would act in conspiracy to deliberately disobey the defendant's instructions.* And if they did do either, it would be virtually incredible that Marcello would retain all three of them to argue the present motion. Further, some significance may be attached to the fact that the same three attorneys have represented the defendant in a number of other prosecutions, and in at least three of them a motion for a change of venue was filed.[4] Finally, and perhaps most importantly, the defendant was present in Court when the motion for a change of venue was argued. He had ample time and opportunity to speak to either his attorneys or to the Court if his attorneys were, in fact, proceeding against his wishes, or if he did, in fact, wish to be tried here. Any assertion that Marcello would sit idly by and allow his attorneys to proceed against his wishes *would be utterly incredible.*

Thus, even if we were willing to draw the inference that the defendant was attacking his attorneys, all the indications would clearly refute such an allegation. Moreover, if there was any doubt whatsoever as to the falsity of such a claim, the fact that Marcello was present and did not indicate the slightest objection to either his attorneys or to the Court would bar all grounds for now objecting. Such knowing acquiescence would surely constitute an intentional and voluntary relinquishment of his right to be tried here. Leser v. United States, 358 F.2d 313 (9th Cir. 1966); Hensley v.

---

4. Prosecutions in which the defendant, represented by the same three attorneys, filed a motion for change of venue were: United States v. Carlos Marcello and Joseph Matassa, Criminal Action No. 29711, E.D.La.1964; United States v. Carlos Marcello and Joseph Marcello, Criminal Action No. 28365, E.D.La.1961; United States v. Carlos Marcello, Criminal Action No. 28366, E.D.La.1961. It

is, of course, proper for us to take judicial notice of the records in these cases. Ackermann v. United States, 178 F.2d 983 (5th Cir. 1949), aff'd 340 U.S. 193, 71 S.Ct. 209, 95 L.Ed. 207 (1950); Romero v. Frank's Casing Crew & Rental Tools, Inc., 229 F.Supp. 41 (W.D.La. 1964), aff'd 342 F.2d 999 (5th Cir. 1965).

United States, 108 U.S.App.D.C. 242, 281 F.2d 605 (D.C.Cir. 1960). Consequently, we find the contention that the defendant did not waive his right to be tried here to be absolutely with no merit whatsoever.

Having found that the defendant did not abandon his motion for change of venue and that his waiver was effective, the question remains as to whether we will vacate our order granting the transfer. While the defendant has not cited us to any authority controlling this situation, we feel that it is governed by the general principle that a request to vacate an order once entered is directed, in the absence of error, to the Court's discretion. See 92 C.J.S. Venue § 200 (1955) and cases cited therein.

Ordinarily, this Court makes every effort to accommodate the wishes of the litigants who appear before us. This is especially true in a criminal case. There are, however, limits to our judicial tolerance. The defendant has seriously strained these limits. He appeared before this Court while his attorneys strenuously argued his well-briefed and excellently prepared motion for change of venue. The argument was adamant and stressed the urgent need to protect the defendant's rights. The argument was well taken and the defendant received the exact relief which he requested and to which he was entitled. Moments later the Court was notified that the defendant had a sudden change of heart. Such an abrupt about-face is extremely strange, to say the least. We have here a defendant who vigorously argued a motion, which was thoroughly thought out in advance, and who, only moments after successfully presenting his motion and while the situation remained exactly the same, requested that the action he so deliberately precipitated be annulled. Either the defendant desired a change of venue or he did not. As indicated above, there can be no doubt that at the time of oral argument, the defendant did desire a change of venue. Yet, now he boldly states that he does not desire a change of venue. The only plausible motive supporting such bizarre conduct is that the defendant is now merely seeking to prepare a record for appeal in the event that he is convicted. The defendant obviously wants two bites at the apple; such fast and loose play, however, is not favored in this Court. We are certainly not suggesting that any defendant must forego any possible means of securing and preserving his rights. Quite the contrary, for this Court is very sensitive to insuring that the rights of each and every defendant be protected at every stage of the litigation. But we refuse to allow a defendant, who has made a binding election, to renounce his choice when his renunciation stems from a "Heads-I-win-tails-you-lose" attitude and which is supported by absolutely no legally acceptable basis. The defendant would be in a better position if his action could be elevated even to the dignity of strategy or trial tactics. But his Janus-faced behavior falls miserably short of this mark.

The defendant seeks to impress us with the promptness of his request. However, merely because the defendant's action resulted from clever and quick thinking does not eradicate the taint of his unworthy motive. Such quick action, in fact, only solidifies our conviction that the defendant was straddling both sides of the fence.

We are not unmindful of the defendant's reliance upon Stevens v. Marks, 383 U.S. 234, 86 S.Ct. 788, 15 L.Ed.2d 724 (1966), for the proposition that a defendant ought to be allowed to withdraw his waiver of a constitutional right when there is no justification for the refusal to do so. We have already pointed out that ordinarily this Court would receive such a request favorably. We are firmly convinced, however, that there is more than good cause present in this case which necessitates our denial of the defendant's request. Because of our strong conviction that the defendant is unlikely to obtain a fair and impartial trial in this state, which prompted our granting the defendant a change of

venue, it is very likely that if he is tried here and convicted, the conviction would be reversed on appeal for lack of due process.[5] Thus, we are taking all possible precautions to insure that the defendant does receive a fair and impartial trial. For this reason and the reason mentioned above, we are compelled to deny the motion to vacate our former order granting the change of venue.

 At the hearing on the motion for change of venue, the Court indicated to the defendant that he would be given thirty days in which to suggest up to three transferee districts to the Court. The government was given the right to make the same number of suggestions as the defendant might make. The Court, however, specifically noted that it would not be bound by any of the suggestions. This was satisfactory to both parties. The defendant has failed to submit any suggestions, and consequently none have been forthcoming from the government. The Court, of course, has the authority under Rule 21(a) to transfer the case to a district of its own choosing. It is the Court's impression that very little, if any, publicity of the defendant has been attendant in at least several divisions of the United States District Court for the Southern District of Texas. Consequently, there ought to be no difficulty in securing a fair and impartial trial for the defendant in that district. Further, as this transferee district is located in the neighboring State of Texas, there should be a minimum of inconvenience to the defendant.

Therefore, it is ordered that the defendant's motion to reconsider the Court's former order directing a change of venue be, and the same is hereby, denied. It is further ordered, adjudged and decreed that the above-styled cause be, and the same is hereby, transferred, together with all the remaining and pending motions, to the United States District Court for the Southern District of Texas.

It is further ordered that the Clerk of this Court take all necessary action to transfer the record and papers in this case to the United States District Court for the Southern District of Texas.

---

5. Even though counsel for defendant stated at the hearing on the present motion that he would not argue to the appellate court, if this case reached that stage, that venue should have been changed, this would not preclude the defendant from arguing on appeal that his trial was lacking in *due process* due to the prejudicial publicity.