UNITED STATES of America, Plaintiff,

v.

Alan H. ABRAHAMS, a/k/a James A. Carr, Defendant.

Crim. No. 78–40–C.

United States District Court,
D. Massachusetts.

June 13, 1978.

On Motion for Reconsideration
July 21, 1978.

Michael A. Collora, Asst. U. S. Atty., Boston, Mass., for plaintiff.

Harvey Brower, Lawrence, Mass., for defendant.

## MEMORANDUM AND ORDER

CAFFREY, Chief Judge.

This matter came before the Court on defendant's motion to dismiss the indictment. The motion is premised on defendant's theory that 18 U.S.C.A. § 1001 does not apply to the judicial function of the United States District Court and that, consequently, the acts allegedly performed by defendant do not fall within the purview of 18 U.S.C.A. § 1001. The motion further alleges that the Magistrate failed to advise defendant of his rights prior to asking him questions as to his name and other matters going to identity at the time defendant was arraigned before the Magistrate.

Upon consideration of the memoranda of law filed with reference to this motion, I rule that defendant's reading of the legislative history of § 1001 is erroneous and that the indictment does charge defendant with a crime within the scope of 18 U.S.C.A. § 1001. *See United States v.*

*Bramblett*, 348 U.S. 503, 506–07, 75 S.Ct. 504, 99 L.Ed. 594 (1955); *United States v. Gilliland*, 312 U.S. 86, 93, 61 S.Ct. 518, 85 L.Ed. 598 (1941). *See also United States v. Chevoor*, 526 F.2d 178, 182–83 (1st Cir. 1975), *cert. denied*, 425 U.S. 935, 96 S.Ct. 1665, 48 L.Ed.2d 176 (1976).

It should also be noted that the Court of Appeals for the District of Columbia has ruled that conduct very similar to that alleged in the instant indictment comes within the proscription of 18 U.S.C.A. § 1001. *See Morgan v. United States*, 114 U.S.App. D.C. 13, 309 F.2d 234, 237 (1962), *cert. denied*, 373 U.S. 917, 83 S.Ct. 1306, 10 L.Ed.2d 416 (1963).

▪ I further rule that the Magistrate's failure to advise defendant of his *Miranda* rights is not a grounds for dismissal of the indictment. *Cf. United States v. Chevoor*, *supra*, at 181. *See also United States v. Mandujano*, 425 U.S. 564, 579–80, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976); *United States v. Kahan*, 415 U.S. 239, 243, 94 S.Ct. 1179, 39 L.Ed.2d 297 (1974).

Accordingly, the motion to dismiss is denied.

This matter is also before the Court upon defendant's motion for change of venue. No memoranda of law were filed with reference to this motion. Upon a reading thereof, it is ORDERED:

Motion denied.

## ON MOTION FOR RECONSIDERATION

The one-count indictment in this case charges that defendant Alan H. Abrahams violated 18 U.S.C.A. § 1001 by knowingly and willfully making unsworn false statements concerning material facts in a matter within the jurisdiction of this Court. In particular, Abrahams is accused of falsely representing to a United States Magistrate during a removal and bail proceeding that his true name was James A. Carr, that he had never used any other name, that he was born on October 24, 1932 in Chicago, Illinois, and that he had never been arrested or convicted of a crime. This matter came on for a hearing on a motion for reconsidera-

tion of this Court's earlier denial of defendant's motion for a change of venue.

On June 13, 1978, this Court, *inter alia*, denied defendant's conclusory and totally unsupported motion, which had been brought pursuant to Fed.R.Crim.P. 21(a), and which alleged that sensational stories by the Boston media about the commodities-futures trading activities and criminal record of the defendant had created so great a prejudice that he could not obtain a fair and impartial trial within the District of Massachusetts. In light of defendant's burden to *show* a reasonable likelihood of prejudicial publicity precluding a fair trial, *see, e.g., United States v. Marcello*, 280 F.Supp. 510, 513–15 (E.D.La.1968), *aff'd* 423 F.2d 993 (5th Cir. 1970); C. Wright, 1 *Federal Practice and Procedure* § 342, at 621–22 & n.18 (collecting cases) (1969), and because of the absence of any affidavits or other evidence of such publicity attached to the initial motion, this Court was not satisfied that a record had been established, as of that time, which justified the extraordinary remedy of a change of venue prior to a *voir dire* of members of a venire. Consequently, the motion was denied.

Subsequent to that ruling, defendant discharged his then attorney and obtained new counsel who have vigorously renewed the motion to change venue. In support thereof, Abrahams' new counsel have offered an affidavit and 78 photocopied pages of articles drawn primarily from the two daily metropolitan Boston newspapers, which in their headlines and bodies flamboyantly discuss the defendant's alleged behavior as a "con man," swindler, and imposter. Because this proffer raised a compelling allegation of massive prejudicial pretrial publicity, this Court granted the motion for reconsideration and set this matter down for and immediately held an evidentiary hearing.

At the hearing, the defendant introduced a voluminous collection of newspaper articles. Although the bulk of the articles are drawn from the Boston Globe and the Boston Herald-American—which I judicially notice are the two major metropolitan daily

newspapers in Boston with a huge circulation in most of eastern Massachusetts—stories about defendant are also included from the Boston Phoenix, the Lawrence Eagle-Tribune, the South Middlesex News, the [Lynn] Daily Evening Item, the New Jersey Daily News, the New York Times, the Wall Street Journal, the Tampa [Florida] Tribune, and Time Magazine. Most of the stories in the non-Boston papers emanated from the wire services—Associated Press and United Press International—presumably for distribution and publication in newspapers throughout Massachusetts and the rest of the nation. The stories, many of which are either front-page or feature-series reports, begin on January 13, 1978 and run up to July 13, 1978.

The newspapers' accounts paint a black and bleak picture of Mr. Abrahams. Repeatedly, in great detail, and often with lurid language, these stories describe, usually as if they were indisputable facts, all of the following alleged activity (and more) of the defendant: (1) his use of half a dozen aliases; (2) the startling discovery of his true identity; (3) his characterization by the FBI as an "armed and dangerous" fugitive; (4) his convictions for income tax fraud, defrauding another commodities dealer, and writing a $3,000 bad check; (5) the charges against him, pending in two other federal courts, three state courts, and Canada, for contempt, prison escape, passport fraud, obtaining money under false pretenses, issuing worthless checks, probation violation for bond default, contributing to the delinquency of a minor, and writing numerous bad checks for large amounts; (6) his failure to appear for various court proceedings; (7) the consequent denial of bail; (8) the fraudulent deceptive, manipulative, and boiler-room practices of his commodity-options dealings; (9) the nationwide investigation and financial collapse of Lloyd, Carr & Co., the largest commodity-options firm in the country; (10) the subsequent receivership proceeding, which involved a search for missing assets in several foreign countries; and (11) not least of all, Abrahams' luxurious lifestyle funded by his ill-gotten gains.

In addition, the Boston newspapers reported and attributed the following statements to Abrahams' counsel and to various public officials: (1) "[Abrahams] would collect on the winning side and then delay paying on the losing side as long as he could . . . Then he'd hit someone else with a bad check, and rob Peter to pay Paul." (William W. Graham, former Monmouth County, New Jersey, assistant prosecutor); (2) "Carr contacted me by telephone . . and confessed he was a fugitive from justice." (F. Lee Bailey, Abrahams' one-time attorney); (3) "[Abrahams is] the ultimate con man." (an unidentified FBI investigator); (4) "[Lloyd, Carr & Co.] may well be the biggest fraud problem in the country right now." (James Stiner, an official of the Commodity Futures Trading Commission); (5) "So far as we know . . . 99.9 percent [of Lloyd, Carr & Co. investors] lost money. We do have a few cases where the customer got *part* of his initial investment back. (original emphasis) (unidentified federal investigator); and (6) "[Abrahams] had an air of confidence about him like Cary Grant in an international jewel thief movie . . . He has lived a very good life at everyone else's expense." (Capt. Andrew B. Manning, Chief of Detectives, Monmouth County, New Jersey, prosecutor's office). Thus, these statements from officialdom have a tendency to be clothed with a particular look of legitimacy in the minds of potential jurors. Suggestively captioned photographs (including a mugshot) and caricatures of the defendant, his lawyers, his homes, and defrauded investors accompanied many of the articles.

The newspaper accounts also contain large-type, sensational headlines of which the following are representative samples:

"Chasing fugitive Carr 'like going after a fox,' says FBI";

"FBI Unmasks James Carr: Says commodity option boss is really a N.J. jailbreaker";

"The emerging portrait of a swindler";

"Picture emerges of fugitive Carr as flim-flam artist";

"Carr customer: 'I was threatened' ";

"Commodity firm's head is escaped convict";

"Wrong-Paying Record Stops Finance 'Wiz' ";

"Life and Troubles of Alan H. Abrams [*sic* ]";

"James Carr and the Commodity Option Game: When they met, it must have been love at first sight";

"Outlaw's Legacy: How a Flim-Flam Man Causes a Big Shake-Up in Commodity Options";

"The Many Faces of Alan Abrahams: 'He never thought of failure' ";

" 'Carr': A nervous eye on the door";

"High living, bouncing checks";

"A flurry of bad checks . . . a legend is born";

"Sun lamps, posh cars made for gilded look."

Cf. *Sheppard v. Maxwell,* 384 U.S. 333, 338–42, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *United States v. Marcello, supra,* 280 F.Supp. at 515–17, 423 F.2d at 1001–02 & nn.11, 12.

Defendant also introduced 38 pages of broadcast transcripts from Channel 5 WCVB–TV (Boston) from the period January 16–25, 1978. Those transcripts reiterated the story of Abrahams' fraudulent activities, flight, and aliases. Defendant also introduced a videotape of a Channel 4 WBZ–TV (Boston) television newscast of June 25, 1978. That telecast matter-of-factly used the phrase "Lloyd-Carr ripoff" to describe the alleged defrauding of commodity options investors by the defendant and his firm. Counsel for the Government and the defendant then stipulated, in the interests of judicial economy, that the plethora of other television and radio broadcasts under subpoena were substantially similar to the Channel 4 videotape viewed and heard by the Court. Cf. *Sheppard v. Maxwell, supra,* 384 U.S. at 342, 86 S.Ct. 1507.

■ Unlike the situation in *Patriarca v. United States,* 402 F.2d 314 (1st Cir. 1968),

*cert. denied,* 393 U.S. 1022, 89 S.Ct. 633, 21 L.Ed.2d 567 (1969), where no "incriminating nexus" was found to exist between the pretrial publicity and trial in the district of indictment, this record is replete with "the kind of prejudicial statements or records of conviction, arrests, or indictments emanating from a public official, zealous attempts by the media to arouse a community on a particular trial, . . . pejorative characterizations of a defendant, [and] description of evidence against the accused . . . [which] presen[t] the 'greatest hazards' to a fair trial . . . ." [citation omitted]. *Id.* at 317. Having in mind the standards concerning prejudicial pretrial publicity, change of venue, and trial court responsibility enunciated in, *e.g., Sheppard v. Maxwell, supra,* 384 at 362–63, 86 S.Ct. 1507; *Rideau v. Louisiana,* 373 U.S. 723, 726–27, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *Patriarca v. United States, supra,* at 317; *A.B.A. Standards, Fair Trial and Free Press* § 3.2 (1968), and the countervailing interest of convenience of prosecution for the Government, I find that the extensive pretrial publicity in all Boston media—with respect to the allegedly unlawful behavior of the defendant and Lloyd, Carr & Co., defendant's prior convictions, and the other charges pending against him—has created in the District of Massachusetts an atmosphere of pervasive community prejudice so inflammatory as to substantially reduce the reasonable likelihood of Abrahams obtaining a fair trial before a panel of impartial jurors anywhere in this District. I also find that the media, in the exercise of First Amendment rights which are not questioned by this Court, see, *e.g., Nebraska Press Assn. v. Stuart,* 427 U.S. 539, 547–70, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976), have made it impossible for Abrahams to receive a fair trial anywhere in Massachusetts, the rest of New England, or the Northeastern section of the United States, including New York, New Jersey, or Pennsylvania.

The Government, relying on *Patriarca v. United States, supra,* contends that this atmosphere can be dissipated by a continuance. That argument, while compelling in

1968 when *Patriarca* was decided, has been undercut by the subsequent enactment of the Speedy Trial Act. This Act requires that Abrahams be tried on the instant indictment within 120 days of his arraignment. As of the date of the hearing, July 19, 1978, Abrahams had left 12 days, plus some excludable days, in which to be tried. Clearly, the degree of prejudice discussed above, whose persistence to the present time is evidenced by the television broadcast of June 25, 1978 and the recent newspaper accounts, could be eliminated only by a continuance substantially longer than that contemplated by the Speedy Trial Act. *See* 18 U.S.C.A. § 3161(h)(8)(A), (B); *Plan for Prompt Disposition of Criminal Cases of the United States District Court for the District of Massachusetts* Sec. III, 9.(b)(8) (July 1, 1978).

The Government's alternative argument for a minor change of venue from Boston to Springfield is equally nonpersuasive. Although served by its own newspapers and radio and television stations, the Springfield area is a major market for the two Boston dailies which contained much of the prejudicial material. New York, New Jersey, and Florida also emerge as inappropriate for the trial of this case, since publication of matters concerning Abrahams and his myriad difficulties in the major metropolitan papers there exerted a similar, albeit a lesser, effect of tainting the minds of potential veniremen with a prejudgment of Abrahams' guilt.

The final issue then is what federal district is appropriate for the transfer of venue. While some of the news accounts were carried by national wire services or news magazines, I am satisfied from my review of the evidence at the hearing that the prejudicial pretrial publicity concerning Abrahams was directed at and localized in the metropolitan and financial centers of the northeastern and southeastern areas of the United States. *Cf. United States v. Marcello, supra,* 280 F.Supp. at 517–18. Among the remaining parts of the country to which a change of venue might be ordered, I have selected the District Court for the Western District of Texas located in San Antonio, as a forum where this defendant can obtain a trial before impartial jurors whose verdict will be based solely on the evidence adduced at trial, and not on sensationalized front-page news accounts.

Therefore, pursuant to Fed.R.Crim.P. 21(a) and in the exercise of my discretion, I rule that defendant's motion for a change of venue should be allowed and this case should be transferred forthwith to the Western District of Texas for trial.

Order accordingly.