**UNITED STATES of America**
v.
**Robert CHEVOOR.**
**Crim. No. 74–72–T.**

United States District Court,
D. Massachusetts.

March 21, 1975.

Joel M. Friedman, Sp.Asst.Atty., Boston, Mass., for United States.

Paul T. Smith, Jeffrey M. Smith, Boston, Mass., for defendant.

## OPINION AND ORDER

TAURO, District Judge.

The defendant, Robert Chevoor, a school teacher in the Watertown High School, has been charged in a three count indictment with knowingly making false statements to a federal grand jury, in violation of 18 U.S.C. § 1623.[1] He has moved to suppress his grand jury testimony and to dismiss this indictment because of the Government's failure to

---

[1]. The indictment charged that Chevoor answered falsely when he denied owing money to Michael Pellicci; when he denied knowing of others who had borrowed money from Pellicci; and when he denied ever discussing with Pellicci the payment of loans made by Pellicci to others.

inform him of his Fifth Amendment rights.[2]

## FINDINGS OF FACT

In January 1973, the Government commenced an intensive investigation into alleged loan sharking activities of one Michael Pellicci (Pellicci). As part of this investigation, the Government applied for and received a court order, under the provisions of 18 U.S.C. § 2518, authorizing the interception of telephone and oral communications from Pellicci's office in Watertown and from his home telephone in Waltham.

The order was issued on November 27, 1973, and interception of calls from Pellicci's home telephone commenced on November 29, 1973. Due to technical difficulties, listening devices for oral conversations, and telephone taps for both office telephones, were not installed until December 5, 1973.

Telephone conversations between the defendant and Pellicci's wife and between the defendant and Pellicci were intercepted on December 7, 1973. These related to setting up a meeting between the defendant and Pellicci. On Sunday, December 9, 1973, a twenty-seven minute converstation between the defendant and Pellicci in Pellicci's office was intercepted, recorded and transcribed. Part of this conversation related to financial transactions between Pellicci and other individuals.

On the evening of January 8, 1974, FBI agent James Vaules (Vaules), along with another agent, went to defendant's home. Vaules' purpose in doing so was to serve a subpoena calling for the defendant to testify the following day before the grand jury with respect to the Pellicci investigation. Prior to serving the subpoena or telling the defendant he would have to appear before the grand jury, Vaules told the defendant he was not a grand jury target, but that it was investigating Pellicci's loan sharking activities. Vaules asked the defendant a number of questions concerning Pellicci, including whether he owed him any money, or knew others that did. The defendant's reply to both queries was negative, and clearly inconsistent with the transcript of his intercepted December 9, 1973 conversation with Pellicci. After talking with the defendant for about fifteen minutes, Vaules told him to report to the office of Strike Force Attorney Joel Friedman (Friedman) prior to his appearance the next day before the grand jury. This instruction also appeared on the face of the subpoena.

The following day, January 9, 1974, the defendant reported as instructed to Friedman's office. Friedman, in the presence of Vaules, told the defendant that he was not a grand jury target, but that Pellicci was under investigation for alleged loan sharking activities. Friedman warned the defendant that he would be prosecuted for perjury if he gave false testimony to the grand jury.

With the transcript of the December 9, 1973, interception before him, Friedman then asked the defendant whether he owed money to Pellicci, whether he knew others that owed money to Pellicci, and whether he had ever discussed with Pellicci the repayment of loans that Pellicci had made to others. The defendant denied owing Pellicci any money and disclaimed all knowledge of his money lending activities.

Friedman then told the defendant that he was not cooperating and that he was not telling the truth. The defendant asked Friedman how and in what way was he not cooperating or telling the truth. At this point, Vaules replied, "We are not going to tell you what we

---

2. Defendant has also moved to dismiss the indictment because of the Government's failure to advise him of the recantation provisions of 18 U.S.C. § 1623(d). *See* United States v. Lardieri, 497 F.2d 317 (3d Cir.), rev'd on rehearing, 506 F.2d 319 (1974).

Since the indictment must be dismissed for the reasons set forth in this opinion, the court does not reach this question, nor does the court reach defendant's motions to suppress wire tap and pen register evidence, tangible evidence and certain oral statements.

have on you." Hearing Transcript, July 9, 1974, at 30.

■ During their January 9, 1973 office interrogation of the defendant, neither Friedman nor Vaules informed him that his conversation with Pellicci on December 9, 1973, had been intercepted; that the questions asked that morning by Friedman had been based on the transcript of that conversation; or that his answers to Vaules on January 8 and to Friedman that morning conflicted with the transcript. Nor did Friedman or Vaules inform the defendant as to the consequences of giving false statements to a federal official.[3]

Shortly thereafter, Friedman escorted the defendant to the grand jury room and asked him essentially the same questions that he had asked in his office and that Vaules had asked on January 8, 1974. The defendant gave the same negative responses. At no time prior to his January 9 interrogation by Friedman, either in his office or before the grand jury, was the defendant given *Miranda*[4] warnings or otherwise advised of his rights under the Fifth and Sixth Amendments. He was not accompanied by counsel, nor did he consult with counsel at any time prior to or during either interrogation.

The defendant's testimony before the grand jury was not completed on January 9 and he was told to return on January 23, 1974. Prior to that date, the defendant consulted with Attorney Paul T. Smith (Smith) who, thereafter, attempted unsuccessfully to secure a copy of his January 9 grand jury testimony. Smith then advised the defendant to assert his constitutional rights and refuse to testify when he appeared before the grand jury on January 23. The defendant followed this advice. On March 13, 1974, this indictment charging the defendant with perjury was returned by the same grand jury.

## CONCLUSIONS OF LAW

### I

■■ There is no duty to inform a grand jury witness, as opposed to a grand jury target, of his constitutional rights, *see, e. g.,* United States v. DiMichele, 375 F.2d 959 (3rd Cir. 1967). The totality of the circumstances preceding this defendant's grand jury testimony, however, made him a potential, if not probable, grand jury target. As such, he should have been advised, prior to his interrogation before the grand jury, of his right to remain silent. The Government's failure to do so requires dismissal of this indictment.

The transcript of the defendant's intercepted December 9, 1973 conversation with Pellicci formed the framework for the questions that were asked of him by Vaules on January 8 and by Friedman on January 9, both in Friedman's office and before the grand jury. Friedman

---

3. "Whoever, in any manner within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both."
18 U.S.C. § 1001.
The F.B.I. is an agency within the meaning of 18 U.S.C. § 1001. *See* United States v. Lambert, 501 F.2d 943 (5th Cir. 1974) (en banc) ; United States v. Adler, 380 F.2d 917 (2d Cir.), cert. denied, 389 U.S. 1006, 88 S. Ct. 561, 19 L.Ed.2d 602 (1967). *But see*

Friedman v. United States, 374 F.2d 363 (8th Cir. 1967).
No case holding that an assistant United States attorney speaking with someone in his office is an "agency" within the purview of 18 U.S.C. § 1001 has been brought to the attention of the court. The scope of the statute is broad enough to reach this situation. "There is no indication in either the committee reports or in the congressional debates that the scope of the statute was to be in any way restricted." United States v. Bramblett, 348 U.S. 503, 507, 75 S.Ct. 504, 507, 99 L.Ed. 594 (1955) (footnotes omitted). In any case, FBI agent Vaules was also present during this interrogation.

4. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

and Vaules knew that defendant's answers to them were in conflict with the intercept transcript, and that the defendant did not know his conversation with Pellicci had been intercepted.[5]

■ Friedman's representation to the defendant, prior to his testimony on January 9, that he was not a grand jury target was at the least misleading. Both he and Vaules knew, or should have known, that the defendant was subject to possible indictment for having made false statements to a federal officer. 18 U.S.C. § 1001.[6] Moreover, having twice questioned the defendant regarding the same material, and having twice received the same responses that were in clear conflict with the intercept transcript, it would have been unrealistic for Vaules and Friedman to assume that defendant would do anything but give the same, apparently untruthful, answers before the grand jury.

Pellicci was undoubtedly the Government's prime interest. But it should have been apparent to Friedman and Vaules that by calling the defendant before the grand jury, without warning him of his rights, they were making him a likely, if not inevitable, grand jury target, albeit for making false statements as opposed to loan sharking. By doing so, they put the defendant in a "no win" position, a classic Hobson's choice. A denial of his conversation with Pellicci would eventually, and in fact did, produce a perjury indictment. If, on the other hand, he changed his story and gave grand jury testimony consistent with the intercept transcript, he faced at least the possibility of being indicted for having given false statements to federal officers on two occasions.[7]

Not only was the defendant not warned of his potential danger, he was in a sense lulled, albeit unintentionally, by Vaules' and Friedman's separate assurances that he was not a target of the grand jury. Also misleading was Vaules' statement to the defendant that "he had to testify." While the subpoena required the defendant's appearance before the grand jury, it did not require substantive testimony from him, absent a grant of immunity.[8]

Defendant's situation here is quite similar to that addressed by the court in United States v. Mandujano, 496 F.2d 1050 (5th Cir. 1974), petition for cert. filed —— U.S. ——, 95 S.Ct. 1422, 43 L. Ed.2d 669 (1974). In that case, the

5. The judge who authorized the intercept had previously determined that the defendant was not an intercept party to whom the Government owed the responsibility of disclosing the existence of the wiretap. 18 U. S.C. § 2518(d).

6. In assessing whether the witness was a virtual or putative defendant, the special attorney's statement to the defendant that he was not a target is not controlling. *See* United States v. Mandujano, 496 F.2d 1050, 1053 (5th Cir. 1974), aff'g 365 F.Supp. 155 (W.D.Tex.1973) ; United States v. Fruchtman, 282 F.Supp. 534 (N.D.Ohio 1968), aff'd on other grounds, 421 F.2d 1019 (6th Cir.), cert. denied, 400 U.S. 849, 91 S.Ct. 39, 27 L. Ed.2d 86 (1970). In *Fruchtman*, the Government attorney had filed an affidavit indicating that he did not consider the witness to be a potential defendant until after his grand jury interrogation. The court held that the witness was a virtual defendant and concluded that "the question should be examined in terms of what the record and transcript show and not on the more subjective facts contained in the Government's affidavit." 282 F.Supp. at 536.

Whether the defendant would have a good defense to an indictment under 18 U.S.C. § 1001 by construing his statements as an "exculpatory no," *see* Paternostro v. United States, 311 F.2d 298 (5th Cir. 1962), is irrelevant in considering whether his statements made him a potential defendant. While there are differences between sections 1001 and 1623, the fact that an essentially similar statement became the basis of a perjury indictment demonstrates that he was at least a potential defendant under section 1001.

7. *See* note 3 *supra*.

8. It is clear that, in addition to appearing before the grand jury, the defendant would have been required to personally assert his constitutional rights. *See, e. g.*, United States v. Capaldo, 402 F.2d 821 (2d Cir. 1968), cert. denied, 394 U.S. 989, 89 S.Ct. 1476, 22 L.Ed.2d 764 (1969).

defendant was indicted for perjury and for attempted distribution of heroin following his grand jury testimony concerning a drug transaction between himself and a Government attorney. The special attorney who questioned Mandujano before the grand jury knew the details of the attempted heroin sale. The interrogation tracked these details. Rejecting the Government's claim that Mandujano was not a target of the grand jury, the district court held that he was a virtual or putative defendant in a custodial situation who was entitled to full *Miranda* warnings. The circuit court affirmed the district court order suppressing Mandujano's grand jury testimony.

> Given the nature of the investigation and the questions tendered by the government attorney, the district court held, and the Court agrees, that full *Miranda* warnings should have been accorded Mandujano who was in the position of a virtual or putative defendant.

496 F.2d at 1052.

█ In discussing the remedy to be granted, the court noted the general rule that the Government's failure to warn a witness of his right to remain silent does not give him a license to commit perjury. United States v. Orta, 253 F. 2d 312 (5th Cir.), cert. denied, 357 U.S. 905, 78 S.Ct. 1149, 2 L.Ed.2d 1156 (1958). In *Mandujano,* the court carved out a limited exception to that rule by stating:

> we simply cannot ignore the unfairness in baiting this defendant before the grand jury and overlook the principle that the Fifth Amendment must always be as broad as the mischief against which it seeks to guard.

496 F.2d at 1056.

The facts in this case are at least as compelling as those in *Mandujano.* It appears clear that prior to the December 9, 1973 intercept of his conversation with Pellicci, the defendant was not a subject of criminal investigation. The underlying theory of the Government's opposition to defendant's motions to suppress and dismiss would be inconsistent with a finding that defendant was anything but a high school teacher who became a loan shark victim. On January 8, 1974, prior to being served with a grand jury summons, the defendant was questioned about Pellicci by an FBI agent. The agent's questions were based on information obtained from the intercept tapes. The defendant did not know his December 9 conversation with Pellicci had been taped. Defendant's responses to the agent on January 8 were at least arguably inconsistent with the intercept tapes. During his conversation with the defendant, the agent told him he was not a grand jury target. The agent served a summons and told the defendant to report to the Strike Force Attorney's office the next day. At this point, the defendant was already subject to prosecution for having given false information to a federal officer.

The next day, at the Strike Force office, the same questions were asked by the Strike Force Attorney in the agent's presence, and the same responses were uttered by the defendant. The defendant was given no warnings and was not told of the intercept tape. At this point, he was subject to a second count of giving false information to a federal officer.

By this time the defendant was clearly something other than a loan shark victim whose testimony was sought to nail a grand jury target. He had graduated to the position of being a likely defendant in a criminal action based on 18 U. S.C. § 1001. Under the circumstances, he should have been warned of his Fifth Amendment right to remain silent prior to the second inquiry by a federal officer. But the Government's failure in this regard is not the issue before the court.

Immediately following the second inquiry, the defendant was brought before the grand jury, was asked the same questions, and gave the same responses. He was not told of the intercept tape. He was not warned of his rights, al-

though he was clearly being put in a situation where his testimony could do nothing but serve as the potential basis for an indictment either for perjury or giving false information to a federal officer.

Unique and compelling circumstances are involved here: 1) a wire tap of a conversation between the defendant and another, unbeknownst to the defendant, 2) two separate statements to federal officials inconsistent with a wire tap, 3) a Government representation to the defendant that he was not a grand jury target, 4) summons of the defendant before a grand jury, without benefit of any *Miranda* warnings, for the purpose of asking him the same things he had already discussed falsely with the agents.

The totality of these circumstances requires the conclusion that the defendant was ensnared into a position where he was at least possibly, if not inevitably, going to emerge as a target of the very grand jury before whom he was required to appear. Fundamental fairness required that he not be compelled to testify before the grand jury without at least having been told of his right to remain silent.

Certainly, there is no more serious crime than that of perjury. The sanctity of the testimonial oath, freely taken, must be observed and enforced at the risk of undermining the very foundation of our judicial process. And so it is clear that the defendant had no right to lie to the grand jury. But he did have a right not to be ensnared into a position where he could not escape the possibility of criminal prosecution because of his own utterances before the grand jury. The Government should not have placed the defendant in such a position of jeopardy.

By forcing the defendant to testify, without alerting him in any way as to his precarious position, the Government turned the screw too tightly and thereby stripped the thread of its case against him. It was unnecessary for the Government to question the defendant before the grand jury for any reason except to get him to testify falsely under oath. There was almost no chance that in the mere passage of a few minutes, he would change his twice told story. And if he did, it would have been clear that the defendant had previously given false information to a federal officer. The Government, however, did not need his grand jury testimony to bring criminal action against him for having given false information on two occasions to a federal officer. That the Government's prime purpose in putting him on the stand was to obtain a perjury indictment is underscored by the Strike Force Attorney's statement to the defendant prior to his grand jury testimony, "I just got six or seven guys like you for perjury . . . ." Hearing Transcript, July 9, 1974, at 30.

## II

Even if the Constitution does not require that the Government warn a grand jury witness in a situation such as this of his right to remain silent, the federal courts, by virtue of their supervisory power over grand jury proceedings, may require that the Government inform such a witness of his right to remain silent. *See* McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943).

> Judicial supervision of the administration of criminal justice in the federal courts implies the duty of establishing and maintaining civilized standards of procedure and evidence. Such standards are not satisfied merely by observance of those minimal historic safeguards for securing trial by reason which are summarized as "due process of law" and below which we reach what is really trial by force.

*Id.* at 340, 63 S.Ct. at 613.

■ It is particularly appropriate for a federal district court to exercise its supervisory powers in the context of a grand jury proceeding. The district court is charged with several important functions in overseeing grand jury pro-

ceedings, including compelling testimony of witnesses, production of records, and modifying or quashing subpoenas. *See* United States v. Calandra, 414 U.S. 338, 346 n. 4, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); Branzburg v. Hayes, 408 U.S. 665, 710, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) (Powell, J., concurring). A legitimate discharge of this supervisory responsibility is that of requiring the Government to inform a potential defendant of his right to remain silent.

"A grand jury is clothed with great independence in many areas, but it remains an appendage of the court . . . ." Brown v. United States, 359 U.S. 41, 49, 79 S.Ct. 539, 546, 3 L.Ed.2d 609 (1959). Neither the grand jury's independence nor its basic functions are hampered by requiring that a defendant, actual or putative, be warned of his most fundamental right—the right against self-incrimination—prior to testifying before the grand jury. In requiring that full *Miranda* warnings be given an actual defendant prior to testifying before the grand jury, the court in United States v. Kreps, 349 F.Supp. 1049, 1053 (W.D.Wis.1972), noted "[i]t would be a simple prophylactic rule, easily complied with . . . ."

The cases cited by the Government in opposition to defendant's claim are inapposite. In many of those cases, the question of informing a witness of his *right to remain silent* was not in issue. The witnesses in those cases had been informed of their right to remain silent, but sought a mandate requiring all *Miranda* warnings.[9] *See* United States v. DiGiovanni, 397 F.2d 409, 412 (7th Cir.), cert. denied, 393 U.S. 924, 89 S.Ct. 256, 21 L.Ed.2d 260 (1968) (transcript disclosed witnesses had been informed of right to silence); United States v. Bind-

er, 453 F.2d 805, 809 (2d Cir. 1971), cert. denied, 407 U.S. 920, 92 S.Ct. 2458, 32 L.Ed.2d 805 (1972) (defendant was given full *Miranda* warnings); United States v. Daniels, 461 F.2d 1076 (5th Cir. 1972) (defendant read and signed Waiver of Fifth Amendment rights); United States v. Winter, 348 F.2d 204 (2d Cir.), cert. denied, 382 U.S. 955, 86 S.Ct. 429, 15 L.Ed.2d 360 (1965) (court found defendant had been fully advised of right to remain silent). *But see* Robinson v. United States, 401 F.2d 248 (9th Cir. 1968). While Robinson did not receive a warning of his right to remain silent, the case is factually distinguishable. In that case, the Government had no knowledge that his prior testimony was false and the court specifically found that he was not a putative defendant.

Here the Government knew from its first contact with defendant that his statements to federal officials prior to his grand jury testimony were in conflict with the intercept transcript. The Government knew, therefore, that defendant's grand jury testimony would either be in similar conflict, or else in conflict with his statements to federal officials.

### III

The Government erred by failing to inform the defendant of his right to remain silent. The more difficult question is whether the usual remedy for failure to give constitutional warnings —suppression of the testimony—should be employed where the testimony itself constitutes perjury.[10]

As a general rule, a failure to inform a witness of his right to remain silent would not excuse perjury or result in the suppression of perjured testimony.

---

9. As a matter of sound practice, it would seem appropriate to give a potential defendant full *Miranda* warnings before he testifies in a grand jury proceeding. This case does not require a determination that such a practice is constitutionally compelled. Here, the defendant was not informed of his most basic right—the right against self-incrimina-

tion. Whether he was entitled to be informed of that right is the narrow issue raised in this case.

10. The same question must be answered even if the Government's actions here are sanctioned under the court's supervisory powers.

*See, e. g.,* United States v. Orta, 253 F. 2d 312 (5th Cir. 1958); United States v. Daniels, 461 F.2d 1076 (5th Cir. 1972). The rationale for this rule is twofold. In the first place a constitutionally abused witness who, nonetheless, testifies truthfully, albeit to his damage, can move to suppress his testimony. *Cf.* United States v. Knox, 396 U.S. 77, 90 S.Ct. 363, 24 L.Ed.2d 275 (1969). A second rationale is that the Fifth Amendment protection against self-incrimination relates to past acts of criminal conduct and was not intended to create an immunity precluding prosecution for perjury. *See* Glickstein v. United States, 222 U.S. 139, 32 S.Ct. 71, 56 L. Ed. 128 (1911).

Neither rationale, however, is adequate in this situation. Here a virtual defendant was called before the grand jury without being advised of his right to remain silent, and was given the stark choice between perjury and self-incrimination. *See, e. g.,* United States v. Mandujano, 496 F.2d 1050, 1058 (5th Cir. 1974); United States v. Rangel, 496 F.2d 1059 (5th Cir. 1974); United States v. Fruchtman, 282 F.Supp. 534 (N.D.Ohio 1968), aff'd on other grounds, 421 F.2d 1019 (6th Cir.), cert. denied, 400 U.S. 849, 91 S.Ct. 39, 27 L.Ed.2d 86 (1970). *But see* United States v. Andrews, 370 F.Supp. 365, 371 (D.Conn. 1974). Under these special circumstances, the only meaningful relief that can be granted is suppression of the testimony or dismissal of the indictment. In *Mandujano,* the Fifth Circuit addressed this problem in detail, noted that even *Orta* appeared to recognize such an exception, 496 F.2d at 1056, and concluded that "the entire proceeding was a violation of Mandujano's due process rights under the Fifth Amendment." *Id.* at 1058. On that basis, the court upheld the suppression of the defendant's grand jury testimony.

The web of circumstances that entwined this defendant compel application to him of the limited exception to the *Orta* rule outlined in *Mandujano.* Due process means fundamental fairness. The same standard is often what motivates remedial supervisory action by federal courts. And so, whether couched in due process terms or in terms of the court's supervisory powers over grand jury proceedings, the special circumstances of this case require that the defendant's grand jury testimony be suppressed and this indictment dismissed.[11]

Accordingly, the indictment is hereby ordered dismissed.

So ordered.

11. This indictment charges the defendant only with testifying falsely before the grand jury. Suppression of that testimony necessitates its dismissal, there having been no representation by the Government as to an independent basis for indictment.